## THE F. E. SPINNER.

### UNION DRY-DOCK CO. v. THE F. E. SPINNER.

*(District Court, N. D. New York. December 29, 1891.)*

**MARITIME LIEN—SALVAGE—EVIDENCE.**

On a libel *in rem* against a vessel for the value of a chain used in raising her from the bottom of a river, it appeared that the libelant contracted by telegraph with a tug company to sell it the chain, and that he delivered the chain to a tug sent for it. He had no communication with the owners or master of the vessel, and there was nothing to show that he knew for what purpose the chain was wanted, except his testimony that he "supposed" and "inferred" that it was for raising the sunken vessel. Six weeks after delivering the chain he wrote to the tug company referring to "our agreement," and proposing to draw for the price of the chain. *Held,* that there was no evidence to support either a maritime lien for supplies furnished or for salvage upon the vessel raised.

In Admiralty. Libel *in rem* by the Union Dry-Dock Company against the F. E. Spinner.

The libel alleges that on September 17, 1885, the libelant furnished and delivered 1,480 feet of steel chain, worth $863, to the steam propeller F. E. Spinner, at the request of her master and owners. That the libelant relied upon the credit of the vessel as well as that of the owners and master, and would not have furnished the chain except upon the credit of the vessel. That by reason of these facts the libelant acquired a lien upon the vessel for the value of the chain. The answer of the owner of the Spinner denies every allegation of the libel which seeks to charge the vessel with liability. On the 10th of September, 1885, the libelant received the following telegram:

"DETROIT, Sept. 10th, 1885.

*"To Capt. M. M. Drake, Supt. Union Dry-Dock, Buffalo, N. Y.:* Want to buy eight or nine hundred feet two inch chain; understand you have it. What's your best price and terms? Answer quick.

"DETROIT TUG AND TRANSIT CO."

This was followed by various telegrams and letters, which culminated in an agreement between the libelant and the Detroit Tug & Transit Company as evidenced by the following telegrams:

"BUFFALO, Sept. 16, 1885.

*"Detroit Tug & Transit Co., Detroit, Mich.:* I will deliver to the tug you name on her arrival here the chain you speak of. My understanding is that you are to have this chain with the option of purchasing it, decision to be made and communicated to me by November first, at a price of forty dollars per ton, or you are to have it for forty-five days at a rental of five hundred dollars. Decision to be made as above, chain to be taken here without cost to us and returned here on same terms, if you choose to have it on rental, damage if any to be made good by you. All the above conditioned on my receipt from you at once of a telegram accepting above terms.

"W. BULLARD."

On the same day the following answer was received:

."DETROIT, MICH., Sept. 16, 1885.

*" W. Bullard, Buffalo:* Your telegram received; we accept terms and conditions stated therein about chains.

"DETROIT TUG & TRANSIT CO.,
"S. A. MURPHY."

Mr. Bullard was the general manager of the libelant at Buffalo. Prior to the first telegram of September 10, 1885, the Spinner was lying sunk in the Sault Ste. Marie river. The chain was delivered on board a tug sent by the Detroit Tug & Transit Company to Buffalo for that purpose, and was used in raising the Spinner by the International Wrecking Company, which company had a contract to raise her with the insurers, to whom the wreck had been abandoned.

After the propeller had been raised, and on the 3d of November, 1885, the following letter was sent by Mr. Bullard:

"BUFFALO, N. Y., Nov. 3, 1885.

*"Mr. S. A. Murphy, Prest. Det. Tug & Trans. Co., Detroit, Mich.*—DEAR SIR: By terms of our agreement of Sept. 16th you were to communicate to me by Nov. 1st your decision as to whether you would pay rental of $500 for 45 days' use of steel chain loaned you or whether you would purchase same at $40 per ton. I have heard nothing from you in regard to the matter. Can I draw on you at sight for the value of the chain at the agreed price named above? Yours, truly, W. BULLARD, Gen'l Mgr."

This letter was never answered. The chain was not returned or paid for.

*Josiah Cook,* for libelant.

*Sherman S. Rogers,* for respondent.

COXE, J. The libel cannot be sustained for salvage. There is neither allegation nor proof of a salvage service. The action is *in rem* to recover

of the Spinner $863, the value of a chain furnished, as the libelant alleges, for the use and on the credit of the vessel and at the request of her master and owners. In order to recover the libelant must prove these allegations. It has wholly failed to do so. The contract was negotiated by telegram and letter. The master and owners of the vessel were not connected with it in any way. The only parties were the libelant on the one side and the Detroit Tug & Transit Company on the other. The latter company hired the chain for 45 days, agreeing to pay $500 rental with an option of purchase at $40 per ton if accepted prior to November 1st. There is not the slightest allusion to the sunken propeller from one end of the correspondence to the other. There is nothing therein to indicate that the libelant knew for what purpose the chain was intended. The two persons who represented the libelant in the negotiations, Capt. Drake and Mr. Bullard, testify that they "supposed" and "inferred" that the chain was to be used in raising the propeller, but neither of them says that it was furnished to the propeller "at the request of her master and owners and upon the credit of said vessel;" neither of them says that there was an intent on the part of the libelant, at any time, to hold the vessel responsible. Indeed, it appears that, six weeks after the delivery of the chain, the libelant still looked for payment to the tug and transit company, and to no one else. On the 3d of November, the libelant, addressing the tug and transit company, refers to "the terms of our agreement" and proposes to draw at sight for the value of the chain.

The contract is too plain to require a resort to inferences drawn from extraneous considerations; but were presumptions necessary or permissible it might be pertinent to inquire whether it is likely that the libelant intended to part with valuable property upon the credit of a foreign bottom, lying as an abandoned wreck, under 138 feet of Canadian water, 500 miles from Buffalo. The fact that individuals interested in the vessel were also connected with the tug company and the wrecking company does not avail the libelant. The evidence shows an agreement between the libelant and the tug company as clear and unmistakable in terms as can well be imagined. A finding that the libelant parted with its chain on the credit of the propeller or with intent to look to her in any contingency for payment, would be wholly unsupported by the proof. It is to be regretted that the libelant has lost its chain, but this is a result which usually follows where an irresponsible party has been trusted.

The libel is dismissed, with costs.